(129 App. Div. 477.)

PEOPLE ex rel. LATHERS et al. v. RAYMOND, Mayor, et al.

(Supreme Court, Appellate Division, Second Department. December 30, 1908.)

1. MUNICIPAL CORPORATIONS (§ 178*)—BOARD OF PUBLIC WORKS—REMOVAL OF MEMBERS.

  The members of the board of public works of the city of New Rochelle are city officers, subject to removal as such,. as their duties, as declared and defined by Laws 1907, p. 1521, c. 661, show that they relate to matters which affect the municipality in distinction from the state.

  [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 178.*]

2. MUNICIPAL CORPORATIONS (§ 178*) — BOARD OF PUBLIC WORKS — APPOINTMENT—AUTHORITY TO REMOVE—"APPOINTED."

  Laws 1907, p. 1521, c. 661, creating a board of public works in the city of New Rochelle, etc., provides (section 1) for their appointment by the mayor subject to the affirmative vote of at least one-half of the number of aldermen in office. Held, that the common council, which consists of the mayor and aldermen, does not appoint such members within the meaning of a charter provision giving the council authority to remove officers "appointed" by them.

  [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 178.*

  For other definitions, see Words and Phrases, vol. 1, pp. 458–461.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. MUNICIPAL CORPORATIONS (§ 178*) — BOARD OF PUBLIC WORKS — APPOINTMENT—"APPOINTED."

The word "appointed," as used in Laws 1907, p. 1521, c. 661, § 1, providing that the members of the board of public works of the city of New Rochelle shall be "appointed" by the mayor, subject to the affirmative vote of the aldermen, is to be taken in its recognized sense of "nominated" or "selected."

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 178.*]

4. MUNICIPAL CORPORATIONS (§ 155*)—REMOVAL OF OFFICERS.

City officers having definite terms cannot be removed at the pleasure of the appointive power.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 343; Dec. Dig. § 155.*]

5. MUNICIPAL CORPORATIONS (§ 155*)—REMOVAL OF OFFICER—INHERENT POWER.

The common council of the city of New Rochelle, authorized by its charter to exercise all the corporate powers conferred, is vested with the inherent power of the municipality to remove its officers for just cause.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 343; Dec. Dig. § 155.*]

6. MUNICIPAL CORPORATIONS (§ 156*)—REMOVAL OF OFFICERS—GROUNDS.

The removal of a city officer must be for a just cause, and the offense must not be merely trivial, but must be of a serious nature directly affecting the rights and interests of the corporation.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 346; Dec. Dig. § 156.*]

7. MUNICIPAL CORPORATIONS (§ 159*) — REMOVAL OF OFFICERS — NOTICE AND HEARING.

As removal of city officers for cause is adversary or judicial, or at least quasi judicial, it requires notice to the officers proceeded against and a hearing.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 353; Dec. Dig. § 159.*]

8. MUNICIPAL CORPORATIONS (§ 159*)—REMOVAL OF OFFICERS—REVIEW BY CERTIORARI.

The determination on a hearing in proceedings to remove city officers for cause is subject to review by certiorari.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 356; Dec. Dig. § 159.*]

9. MUNICIPAL CORPORATIONS (§ 178*) — REMOVAL OF OFFICERS — EVIDENCE OF MISCONDUCT—SUFFICIENCY.

Evidence *held* not to show insubordination, neglect of duty, or irregularities in their offices sufficient to justify the removal of members of a city board of public works.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 178.*]

Certiorari by the People on the relation of Richard Lathers, Jr., and others, against George C. Raymond, Mayor, and others, constituting the Common Council of the City of New Rochelle. Determination annulled, and relators reinstated in offices from which they had been removed.

Argued before JENKS, HOOKER, GAYNOR, RICH, and MILLER, JJ.

J. Addison Young, for relators.

Michael J. Tierney, for respondents.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

JENKS, J. This certiorari is to review the removal of the three members of the board of public works of the city of New Rochelle. The relators contend that the relators are not city officers, so that they cannot be removed by the common council, that, even if they are city officers, there is no power of removal in that body, and that the facts did not justify removal, even if there was official authority therefor. I think that the officials are city officers, for their duties, as declared and defined by chapter 661, p. 1521, of the Laws of 1907, show that such duties relate to matters which affect the municipality in distinction from the state. Dillon on Municipal Corporations (4th Ed.) § 58, and authorities cited; Bieling v. City of Brooklyn, 120 N. Y. 98, 24 N. E. 389. The learned corporation counsel insists that the power of removal is vested in the common council by section 19 of the charter of the city, which reads:

"Suspension and Removal.—The common council and each city board may remove any city officer appointed by them, for dishonesty, incapacity, neglect of duty, or other irregularities, giving such officers reasonable notice thereof and a reasonable opportunity to be heard, and such officer may be suspended pending such investigation.

"Filling Vacancies in City Offices.—Except as otherwise provided in this act, if a vacancy shall occur otherwise than by expiration of term, in any elective office of the city, the common council shall appoint a person to fill such vacancy for the balance of the unexpired term. A vacancy occurring in any appointive office of the city, otherwise than by expiration of term, shall be filled for the balance of the unexpired term by the same authorities and in the same manner as an appointment for a full term."

This contention involves the question whether these officers are appointed by the common council. The provision of appointment is in section 1 of the said act of 1907, which reads:

"Within thirty days after the passage of this act there shall be appointed by the mayor of the city of New Rochelle, subject to the affirmative vote of at least one-half of the number of aldermen in office, three citizens of the city of New Rochelle, who shall constitute the board of public works of the city of New Rochelle, who shall serve without compensation. One of said commissioners shall be appointed for six years, one for four years and one for two years from May first, nineteen hundred and seven."

Although the common council consists of the mayor and aldermen (section 50 of article 4 of the charter [Laws 1899, p. 174, c. 128]), I think that the common council does not appoint those commissioners. The provision quoted contemplates nominations by the mayor and confirmations by the aldermen. Strictly speaking, neither the mayor alone appoints nor the aldermen alone appoint. The word "appointed," as used to describe the action of the mayor, is to be taken in its recognized sense of "nominated" or "selected." People ex rel. Kresser v. Fitzsimmons, 68 N. Y. 519. Much less can it be said that the power in the aldermen of confirmation is that of appointment. The Constitution of this state provides that certain state officers are "appointed by the Governor by and with the consent of the Senate," and the Constitution of the United States provides that as to certain officers the President "shall nominate and by and with the consent of the Senate of the United States appoint" them, but none would contend that perforce of the power of confirmation either the state Senate or the United

States Senate appoints such officials. The charter does not even provide that the common council (which is composed of the aldermen and the mayor) shall confirm, but the aldermen, and the same act also indicates the distinction between the mere power of confirmation and that of appointment, in that section 20 of article 2 (Laws 1899, p. 161, c. 128) provides:

"Except as otherwise provided in this act, if a vacancy shall occur otherwise than by expiration of term, in any elective office of the city, the common council shall appoint a person to fill such vacancy for the balance of the unexpired term. A vacancy occurring in any appointive office of the city, otherwise than by expiration of term, shall be filled for the balance of the unexpired term by the same authorities and in the same manner as an appointment for a full term."

If the appointments were made by the aldermen or by the common council, the recognized procedure would be a choice by that body subject to the approval by the mayor. Cassidy v. City of Brooklyn, 60 Barb. 105, affirmed on opinion 47 N. Y. 659; People ex rel. Ennis v. Schroeder, 76 N. Y. 160; People ex rel. Kehoe v. Fitchie, 76 Hun, 80, 28 N. Y. Supp. 600. I do not find a provision in charter or in statute, and I am not cited to any one, other than the section discussed, that expressly provides for the removal of the three commissioners. They cannot be removed at the pleasure of the appointive power, for they have definite terms of office. Section 1, c. 661, p. 1521, Laws 1907.

If, then, the common council have the power of removal, it must be found in the inherent power in a municipal corporation to remove its officers. This power is recognized. Dillon on Municipal Corporations (4th Ed.) § 240, citing authorities which find their source in the judgment of Lord Mansfield in the famous case of Rex v. Richardson, 1 Burr. 517, says:

"The power to amove a corporate officer from his office, for reasonable and just cause, is one of the common-law incidents of all corporations. This doctrine, though declared before, has been considered as settled ever since Lord Mansfield's judgment in the well-known case of The King v. Richardson. It is there denied that there can be no power of amotion unless given by charter or prescription; and the contrary doctrine is asserted—that from the reason of the thing, from the nature of corporations, and for the sake of order and government, the power is incidental."

See, too, Mechem on Public Officers, § 446.

No question is presented in this case of a limitation by the Legislature upon this municipal corporation as to the power of removal perforce of a prescribed procedure, which, however, the Legislature, when legislating, within the Constitution might have ordained. People ex rel. Percival v. Cram, 164 N. Y. 166, 58 N. E. 112; Matter of Stutzbach v. Coler, 168 N. Y. 416, 61 N. E. 697. I think that this inherent power of removal is vested in the common council of this city. Dillon, Municipal Corporations (4th Ed.), at section 242 says:

"By the corporation at large, as used in the preceding section, is meant the different ranks and orders which compose it, including the definite and indefinite bodies. The essentials in such a corporation of a valid corporate assembly have previously been described. Our American corporations, however, have no ranks, orders, or integral parts corresponding to the constitution of an old English corporation. Here the common council, or the elective governing body (whatever name be given to it) exercises all of the powers of the

incorporated place. Has the council, as the representative of the corporation, the incidental powers of a corporation, such as the power to amove, or the power to ordain by-laws? Or is the council in the nature of a select body, possessing no right to exercise any of the ordinary incidental powers of the corporation, unless expressly authorized by charter or legislative grant? The question not being judicially settled as to our municipal corporations, the opinion is ventured that, in the absence of an express grant or statute conferring or limiting the power, the common council of one of our municipal corporations, as ordinarily constituted, does possess, in the absence of any express or implied restriction in the charter, the incidental power, not only to make by-laws, but, for cause, to expel its members, and, for cause, to remove corporate officers, whether elected by it or by the people."

See, also, section 243.

And section 58 of the charter provides:

"The common council shall exercise all of the corporate powers conferred by this act"—which act in itself constitutes the municipal corporation. Section 2, Charter.

It is well settled that such removal must be for just cause. Dillon on Municipal Corporations, § 251. And Lord Mansfield in Rex v. Richardson, supra, indicates the classes of misconduct which may subject the officer to such penalty:

"(1) Such as have no immediate relation to his office, but are in themselves of so infamous a nature, as to render the offender unfit to execute any public franchise.

"(2) Such as are only against his oath, and the duty of his office as a corporator; and amount to breaches of the tacit condition annexed to his franchise or office.

"(3) The third sort of offense for which an officer or corporator may be displaced is of a mixed nature; as being an offense not only against the duty of his office, but also a matter indictable at common law."

See, too, State ex rel. v. Walker, 68 Mo. App. 110–119.

The offending must not be merely trivial, but it must be "of a serious nature directly affecting the rights and interests of the corporation." Dillon, Municipal Corporations, § 252, citing authorities. As removal for cause is adversary or judicial, or at least quasi judicial, it requires notice to the officers proceeded against and a hearing. Dillon, Municipal Corporations, § 251; Rex v. Richardson, supra; People ex rel. Mayor v. Nichols, 79 N. Y. 582–588; People ex rel. Gere v. Whitlock, 92 N. Y. 191–198; Andrews v. King, 77 Me. 234. And the determination upon such hearing is subject to review by certiorari. People ex rel. Mayor v. Nichols, supra; State v. Common Council, 53 Minn. 238, 55 N. W. 118, 39 Am. St. Rep. 595.

Aside from the questions of law, section 2140 of the Code of Civil Procedure provides, so far as the facts are concerned, that the court shall determine the question by the criterion "whether there was, upon all the evidence, such a preponderance of proof, against the existence of any of those facts, that the verdict of a jury, affirming the existence thereof, rendered in an action in the Supreme Court, triable by a jury, would be set aside by the court, as against the weight of evidence." And this court in its first department has said:

"When charges have a real basis or foundation, are made in good faith, and not as a mere pretext for removal, and they are of a substantial nature, showing some neglect of duty on the part of the officer, or something which

114 N.Y.S.—24

materially affects his official acts, or his standing and character, and the officer is given an opportunity to explain away the charges, which explanation is received and acted upon in good faith, then the sufficiency of the proof, and the propriety of the removal under the statute rest entirely with the removing officer. People ex rel. Mitchel v. La Grange, 2 App. Div. 444, 37 N. Y. Supp. 991." People ex rel. Walsh v. Brady, 48 App. Div. 128, 62 N. Y. Supp. 603.

The board was created pursuant to the said chapter of the Laws of 1907. Its three members were appointed in August of that year, of whom all are removed by these proceedings. Of that number Mr. Lathers had been a sewer commissioner for the five years previous to his appointment, Dr. Vulte had been a sewer commissioner from 1888 to 1895 and health commissioner, and Mr. Cooper had been a health commissioner. All were laymen. Among their other duties, those of the old sewer commissioners were cast upon them. The common council which heard and acted upon these charges took office on January 1, 1908. The charges were preferred in August and September, 1908, and after due notice were heard. The defendants were adjudged guilty of insubordination and neglect of duty, in that they passed this resolve:

"That no contract will hereafter be awarded by this board unless the comptroller has certified on the same that the funds are available to pay for such work."

Mr. Lathers testified that before the passage of this resolve he called upon the new comptroller of the city and told him that, inasmuch as the old sewer commissioners in former years had such trouble in "financing their contracts," the board had decided that it would not do work unless it was "financed," and that the comptroller, who was a lawyer, suggested the passage of a resolution that the contracts should be indorsed by him to the effect that the money was in sight or provided by resolution. It appears that the comptroller informed two of the commissioners that each commissioner was personally liable for letting contracts without provision having been made for the payments thereunder, and Dr. Vulte testifies that the comptroller said that he would hold any member of the board liable for such action. Mr. Lathers testified that such alleged liability was then first called to his attention. After this interview with the comptroller, the board passed this resolve. This testimony is not contradicted. It further appears without contradiction that eight days after the passage of the resolution the commissioners met the mayor and the aldermen (with one or possibly two exceptions) at the home of the mayor, and that Mr. Lathers said that his board had a deficit of $16,000, that they would not do work until the money was provided, that the board did not mean that the money must be in bank, but that its use must be authorized by proper resolution, or that it must be set aside to the credit of the board. He gave his reasons for this attitude, drawn from his past official experience. The mayor thanked the commissioners and said that he was in accord, and none of the aldermen expressed any dissent. It further appeared that the resolve remained upon the records until July 24, 1908, when the commissioners received a communication from the corporation counsel that the resolve was ultra vires,

whereupon it was rescinded immediately. Mr. Lathers testified that the deficit referred to represented overdrafts for outstanding public work for which, under the law, there could have been issued adequate bonds and certificates, which issue was mandatory on the common council, and that at the time of such overdrafts they had repeatedly asked the common council to issue the proper obligations.

I cannot see any proof of insubordination, which, as I understand it, means disobedience of lawful authority or resistance to it. In view of the experience of the sewer commission, and of its inability to procure the means for outstanding public work which were available, these commissioners decided upon a halt in their work, and after consultation with the comptroller, and under his advice and warning, formulated their decision by this resolution. They communicated their course to the head of the city and a majority of the members of the common council, and received approval from the mayor, and heard no dissent from those aldermen. When informed by the legal officer of the city that its resolve was beyond its powers, the commission rescinded it forthwith. It is not contended that the passage of such resolution was in the teeth of any express prohibition, but that it trenched on the power of the common council. The resolve on its face indicates action in good faith in furtherance of a conservative course in city administration, and in accord with the checks required by the charter of the greatest city of this continent. See section 149 (Laws 1901, p. 50, c. 466), Greater New York Charter.

Under other specifications the relators were adjudged guilty of insubordination, neglect of duty, and irregularity, in that as such commissioners, since May 19, 1908, they wholly neglected and refused to lay and to construct public cross-walks on Webster avenue as ordered by the common council, also a public sewer in part of Union avenue, and since June 2, 1908, to procure bids for the completion of the work of curbing, guttering, and flagging certain specified streets, and since said date that they failed and refused to proceed with work upon a public sewer in Hillside avenue. The answer of the commissioners as to Webster avenue was that the common council had never asked for any estimate of the cost, or maps or profile, and that no appropriation had been made for the work. The commissioners evidently rested upon section 4 of the said chapter 661, p. 1522, of the Laws of 1907, which provides:

"When any of said work is to be done the common council shall take such action in regard thereto as is now provided by law, and shall thereupon order the board of public works to submit to it proper maps, profiles and estimates and other details for said work and may then order said work done by the said board of public works."

It also appears that there is evidence that it was customary to set aside money for such work. However, after the board of public works had rescinded the said resolution of January 9th, a contractor was asked to make a bid for the work, which was not required to be done under advertisement. The contractor came back after making an appointment with the engineer, and asked whether the money had been appropriated, and, when told it had not, refused to bid. Mr. Lathers told the mayor, who asked him to try to get some other bids, and he

did so. Finally the commission received a bid from the same contractor, conditioned upon the money being set to their credit, and the common council was then so notified. As to the other work, the same explanation was made as to the lack of appropriation. Moreover, it appeared that on June 4, 1908, the mayor, the aldermen—or certainly a majority of them—the board of public works, the superintendent of streets, and the engineer of the public works board, met and discussed the various improvements ordered by the common council. Mr. Lathers stated to the aldermen that they had not provided any money to do any public work. Chairman Lewis, of the finance committee of the common council, said there was not much money; that the general street fund was very low. Mr. Lewis and Mr. Lathers went over the estimates of the amount of the assessments on Union and Hillside avenue sewers for which certificates of indebtedness could be issued, and the amount of the bonds that could be issued for them, and it was understood by Mr. Lathers that the common council were to issue certificates and bonds therefor. Before this time the board of public works had given the aldermen information showing the amount of outstanding sewers unpaid for, a statement of certificates and bonds that they wished, and Mr. Lewis and Mr. Lathers checked off from that statement how many bonds and certificates could be issued.

Thus, very shortly after these resolutions of the common council, there was held this meeting at which the whole matter was gone into. It does not appear that there was any complaint thereat as to any neglect or refusal of the board of public works to go forward with the work. Mr. Lathers testified that he could not recall any complaint, and Dr. Vulte testified that nothing was said as to the failure of the board to proceed with the curbing or guttering, the sewers, or the work mentioned in the charges or specifications. On July 14th a conference was held between the board of public works and the public improvement committee of the common council, and it was agreed that the common council would sell the necessary certificates of indebtedness and bonds, in order that the work might go forward, and the board of public works agreed to proceed therewith. This was after discussion pro and con as to the propriety and advisability of this step. The advertising for the work was begun. On July 21, 1908, the public improvement committee of the common council recommended to the council the issue of bonds and certificates, and the common council passed a resolution therefor. Bids were then received by the board of public works, and contracts for all the work excepting the cross-walk on Webster avenue, which was under $200, were awarded. It appeared at the hearing of these charges that those contracts were ready.

Two of the three supplemental charges filed on September 10, 1908, were for neglect of duty and violation of law, and the third was for insubordination and neglect of duty. These charges and the specifications thereunder upon which the commissioners were adjuded guilty relate to certain contracts for sewer construction. It was adjudged: That these commissioners, having officially exacted from Rumsey, as trustee of the Rumsey estate, $2,525 in payment of assessments for public sewers, failed to pay it over to its owner, the city, save $91; that

they unlawfully canceled the assessments on their books; and that, after having delivered their warrant to the receiver of taxes for the collection of such assessments, they collected the assessments. It was also adjudged that these commissioners unlawfully contracted with the Echo Realty Company for the construction of sewers in Pine Park, that the advertisement was arranged collusively in advance with the Echo Company to contain a notice that the bids (sic) should be paid for only when the assessments therefor were paid, whereby it was effected that the sole bidder should be the said Echo Realty Company. It was adjudged that the same scheme was worked as to a contract with the Meighan Land Company and Kusche for sewer construction in Nautilus Park. It was also adjudged that the commissioners unlawfully exacted from Dorr $80, pretending it was for an assessment against his property for sewer construction, when said assessment had not been legally authorized, and that they had failed to pay over the same. Mr. Lathers testified that there were altogether nine of these so-called special contracts for sewer construction, all of which were ordered by the common council in 1905, and that the first contract was drawn up by the engineer of the sewer board and the then corporation counsel. It appeared that owners of tracts of private property about to be improved applied for sewers thereon, and were told that the city was in no financial condition to do the work, or at least the aldermen would not authorize provision therefor, and that the matter was a private enterprise. However, the upshot of it was that the common council authorized the contracts with the provision that there should be no cost to the city for construction, and the owners built the sewers without cost to the city save for advertisements; but it was thought best to go through the form of making an assessment on the completion of the contracts. By and with the advice of the corporation counsel, the commissioners turned over at once the check received from the owner for the assessment, inasmuch as that owner had built the sewers at its own cost. The assessment was then marked paid. The reason for this procedure was that it was agreed that otherwise a sewer assessment might be laid in after years, and unjustly. Moreover, it appears that upon at least one of these contracts the corporation counsel indorsed his official approval, and the testimony is that the contracts were all in similar form. The two contracts which were executed subsequent to the creation of this board were indorsed by the comptroller as follows:

"Estimated amount of $No liability hereunder entered on the books of the city of New Rochelle.　　　　Edward Stetson Griffing, Comptroller."

It would have been manifestly unjust that a private owner who had defrayed the entire cost of the improvement should pay over the amount thereof to the city, which had neither incurred liability nor made any outlay. So far as the withdrawal of the warrant is concerned, it appeared that, in response to a general question of the propriety of this step, the commissioners were advised by the corporation counsel in writing that it might be taken.

It appeared from the testimony of Mr. Lathers that when Mr. Dorr appeared before the board and asked permission to connect his house,

situate on West Castle Place, then an unsewered street, with the sewer in Chestnut Lane, he was told that he could do so by making this house connection at his own expense, but that he must pay the regular frontage tax of $1.70 a foot before he made it. He went away, and later the board of health ordered a sewer built in the entire length of West Castle Place. The board ascertained that none but Mr. Dorr would use such sewer, and, as an estimate therefor was about $800, the board suggested that the board of health should rescind its order or obtain the house connection from the next door sewer connection, which would cost but $175. The common council ordered it. The commissioners wrote to Mr. Dorr, asking him to prepay the amount of the assessment, which he did. The board advised the common council that they had received the sum of $80.70, and asked it to appropriate the money, which was done and put to the credit of the board. It was then determined by the board that it was not properly a house connection, but a sewer, in that the board could not find any authority to build such connection for a private person at his own cost. The board thought it necessary to have an assessment, and so one was made, advertised, and confirmed, and thereupon the board directed its clerk to. pay this money over to the receiver of taxes and to send a receipt to Mr. Dorr. The clerk reported to the board that he had done so. The commissioners regarded themselves, when they were asked to turn this money over, as but the agents of Mr. Dorr, in that he owed no money until the assessment was made. As I have said, the assessment was made, and the clerk reported to the board that the identical money which had been kept in its safe was turned over with the warrant to the tax receiver.

I think that a verdict of a jury against these relators, to the effect that they were guilty of insubordination or neglect of duties or of irregularities in their offices, could not stand. There is practically no question over the records, or that the relators did or omitted to do what was charged against them; but, on the other hand, the testimony of the commissioners in explanation of their conduct is in many instances corroborated by the records and by other witnesses, and such testimony is not materially contradicted. There is no impugnment of their good faith and no proof that their acts and omissions were not open and well known or communicated by them to the city authorities. There is not the slightest proof of any corruption or peculation, and, as far as I can see, these officials were intelligent and honest citizens, who strove without pay to serve the public interests of the city.

Their alleged "insubordination"—which I understand means disobedience of lawful authority or resistance to it—consisted of passing a resolve that they would not do any more work until the means were provided, which was dictated by experience of past deficits and complications, advised by the chief fiscal officer of the city, a lawyer, with his warning that they would be personally liable for public work not thus provided for. The action and the reasons therefor were communicated to the mayor and the aldermen, with approval from the one and without disapproval from the other. This resolve was rescinded forthwith when it was pronounced ultra vires. The other acts of insubordination or neglect of duty or of irregularity were in part deduced from

their nonaction under this resolution during the time that they supposed it was within their power. Their inaction, which was the consequence of their resolution, was thoroughly understood. They did not hold themselves aloof, as resistants, behind that resolution, but frankly explained their position, without receiving any censure from the other city authorities, and sought the co-operation of such officials to remove the obstacles in the way of further work. After the rescission of the resolve there is no criticism possible of their course. The other acts of alleged misconduct in the matter of the special contracts are spelled out by applying to a course of mere formal assessments, in cases where as matter of fact, as was well known at the time, the owner of the property made his own improvements at his own expense, the tests which were applicable to actual assessments, as if the city were to defray the expenses in the first instance. If the commissioners had done the things the nondoing of which is now charged against them, they would have done flagrant injustice. Whatever they did or did not seems to have had the approval, or at least the acquiescence, of the other city authorities at the time. These matters were not done in the dark. Their conduct, even under the light of the severe criticism which naturally would select the supposed errors therein and naught else, did not deserve censure, much less removal from office.

The determination should be annulled in every respect, and the relators reinstated, with $50 costs and disbursements. All concur.